## UNITED STATES *v.* MUNIZ ET AL.

No. 464.   Argued April 22–23, 1963.—Decided June 17, 1963.

*J. William Doolittle* argued the cause for the United States.   With him on the briefs were *Solicitor General Cox, Acting Assistant Attorney General Douglas, Morton Hollander* and *Howard E. Shapiro.*

*John J. Abt* and *Richard D. Friedman* argued the cause for respondents.   With them on the briefs was *Charles Andrews Ellis.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question in this case is whether a person can sue under the Federal Tort Claims Act [1] to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee.   For reasons to be developed below, we hold that such suits are within the purview of the Act.

This litigation, brought here by the Government as a single case, arises from two separate suits for personal injuries brought by respondents Henry Winston and Carlos Muniz in the United States District Court for the

---

[1] 28 U. S. C. §§ 1346 (b), 2671–2680.

Southern District of New York. Both sought damages for personal injuries suffered while. they were confined in federal prisons. The district judge granted the Government's motions to dismiss in both cases on the ground that such suits were not permitted by the Federal Tort Claims Act. The Court of Appeals for the Second Circuit, sitting *en banc*, reversed, four judges. dissenting. 305 F. 2d 264, 287.[2] Because the decision below involves an important question in the construction of the Federal Tort Claims Act and because two Courts of Appeals had previously reached a contrary result,[3] we granted certiorari. 371 U. S. 919.

Winston alleged that in April 1959, while he was confined in the United States Penitentiary at Terre Haute, Indiana, he began suffering dizziness, loss of balance, and difficulty with his vision. Upon Winston's initial complaint, the prison medical officer's diagnosis was borderline hypertension; the treatment, a reduction in weight. Winston's symptoms nevertheless recurred with increasing severity over the next nine months; he was unable to keep his balance and fell frequently. He also began to suffer periodic loss of vision. Despite repeated complaints to the prison officers, Winston was given no further treatment, except some dramamine for his dizziness. In January 1960, Winston's attorney became alarmed by his condition and had him examined by a consulting physician. In February 1960, an operation successfully removed the benign brain tumor which had caused Winston's difficulties, but his sight could not be saved.

---

[2] The orders of the District Court were initially reversed by a panel of three judges, one judge dissenting. 305 F. 2d 253, 285. On rehearing *en banc*, the panel decisions were upheld. 305 F. 2d 264, 287.

[3] *James* v. *United States*, 280 F. 2d 428 (C. A. 8th Cir.), cert. denied, 364 U. S. 845; *Lack* v. *United States*, 262 F. 2d 167 (C. A. 8th Cir.); *Jones* v. *United States*, 249 F. 2d 864 (C. A. 7th Cir.).

Winston alleged that the negligence of the prison employees was responsible for the delay in diagnosis and removal of the tumor and caused his blindness.

Respondent Muniz alleged that he was, in August 1959, a prisoner in a federal correctional institution in Danbury, Connecticut. On the afternoon of August 24, Muniz was outside one of the institution's dormitories when he was struck by an inmate, and then pursued by 12 inmates into another dormitory. A prison guard, apparently choosing to confine the altercation instead of interceding, locked the dormitory. The 12 inmates who had chased Muniz into the dormitory set upon him, beating him with chairs and sticks until he was unconscious. Muniz sustained a fractured skull and ultimately lost the vision of his right eye. He alleged that the prison officials were negligent in failing to provide enough guards to prevent the assaults leading to his injuries and in letting prisoners, some of whom were mentally abnormal, intermingle without adequate supervision.

Whether respondents are entitled to maintain these suits requires us to determine what Congress intended when it passed the Federal Tort Claims Act in 1946. This question would not appear at first glance to pose serious difficulty. Congress used neither intricate nor restrictive language in waiving the Government's sovereign immunity. It gave the District Courts jurisdiction

> "of civil actions on claims against the United States, for money damages, . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U. S. C. § 1346 (b).

The Act also provides that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U. S. C. § 2674. Congress qualified this general waiver of immunity in 28 U. S. C. § 2680 by excepting from the Act claims arising from certain government activity, such as transmission of postal matter, assessment of taxes, imposition of a quarantine, or operation of the Panama Canal. None of the exceptions precludes suit against the Government by federal prisoners for injuries sustained in prison. So far as it appears from the face of the Act, Congress has clearly consented to suits such as those involved in the case at bar. Whether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law, but prisoners are at least not prohibited from suing. Since a number of lower courts have nevertheless reached a contrary conclusion,[4] largely in reliance upon our decision in *Feres* v. *United States,* 340 U. S. 135, we deem it appropriate to make a more detailed investigation into the intent of Congress.

An examination of the legislative history of the Act reinforces our conclusion that Congress intended to permit such suits. For a number of reasons, it appears that Congress was well aware of claims by federal prisoners

---

[4] *James* v. *United States,* 280 F. 2d 428 (C. A. 8th Cir.), cert. denied, 364 U. S. 845; *Lack* v. *United States,* 262 F. 2d 167 (C. A. 8th Cir.); *Jones* v. *United States,* 249 F. 2d 864 (C. A. 7th Cir.); *Berman* v. *United States,* 170 F. Supp. 107; *Golub* v. *United States,* Civil No. 148–117, D. C. S. D. N. Y., Oct. 5, 1959; *Collins* v. *United States,* No. T–1509, D. C. D. Kansas, Jan. 29, 1958; *Trostle* v. *United States,* No. 1493, D. C. W. D. Mo., Feb. 20, 1958; *Van Zuch* v. *United States,* 118 F. Supp. 468; *Shew* v. *United States,* 116 F. Supp. 1; *Sigmon* v. *United States,* 110 F. Supp. 906; *Ellison* v. *United States,* No. 1003, D. C. W. D. N. C., July 26, 1951.

and that its failure to exclude them from the provisions of the Act in 28 U. S. C. § 2680 was deliberate. First, the Federal Tort Claims Act, as part of the Legislative Reorganization Act of 1946,[5] was designed not only to avoid injustice to those having meritorious claims hitherto barred by sovereign immunity, but to eliminate the burden on Congress of investigating and passing upon private bills seeking individual relief. See *Dalehite* v. *United States,* 346 U. S. 15, 24–25; *Feres* v. *United States,* 340 U. S. 135, 139–140.[6] The task of screening these bills was substantial. See, *e. g.,* 74 Cong. Rec. 6868. Private claim bills introduced in the Sixty-eighth through the Seventy-eighth Congresses averaged 2,000 or more per Congress, roughly 20% of which were enacted. H. R. Rep. No. 1287, 79th Cong., 1st Sess. Among the private claim bills were a number submitted on behalf of federal prisoners, of which, between 1935 and 1946, Congress passed 21.[7] The much larger number of private bills that must have been introduced were therefore among those adding to Congress' burdens. In these circumstances it cannot be assumed that Congress was unaware of their presence.

---

[5] August 2, 1946, c. 753, 60 Stat. 812.

[6] To ensure transfer of private claims to the courts, Congress prohibited introduction of private bills for claims cognizable under the Federal Tort Claims Act. Legislative Reorganization Act of 1946, § 131, 60 Stat. 831, 2 U. S. C. § 190g.

[7] Act of August 13, 1935, 49 Stat. 2132; Act of August 26, 1935, 49 Stat. 2182; Act of March 7, 1936, 49 Stat. 2233; Act of March 7, 1936, 49 Stat. 2234; Act of June 11, 1937, 50 Stat. 986; Act of June 15, 1937, 50 Stat. 993; Act of June 29, 1937, 50 Stat. 1011; Act of July 19, 1937, 50 Stat. 1036; Act of April 13, 1938, 52 Stat. 1293; Act of July 15, 1939, 53 Stat. 1473; Act of August 5, 1939, 53 Stat. 1501; Act of August 21, 1941, 55 Stat. 955; Act of November 21, 1941, 55 Stat. 971; Act of February 10, 1942, 56 Stat. 1101; Act of February 18, 1942, 56 Stat. 1112; Act of June 6, 1942, 56 Stat. 1180; Act of December 17, 1942, 56 Stat. 1244; Act of February 22, 1944, 58 Stat. 948; Act of May 29, 1944, 58 Stat. 982; Act of December 20, 1944, 58 Stat. 1070; Act of July 25, 1946, 60 Stat. 1264.

A second indication that Congress was conscious of claims by federal prisoners is found in the prior versions of the Act. Efforts to permit tort suits against the Government began in 1925 with the introduction of H. R. 12178, 68th Cong., 2d Sess.[8] Thereafter, at least one bill was introduced in every Congress, with the exception of the Seventy-fifth, until the present Act was passed by the Seventy-ninth Congress in 1946. Though the provisions of these bills underwent change during the intervening 21 years, the similarities are noteworthy. With the amendment of S. 1912 in the Sixty-ninth Congress, First Session, for example, came the first specific exceptions to the general waiver of sovereign immunity. Two of those exceptions, relating to postal matters and taxation, were cast in language virtually identical to that used in the Act ultimately passed 20 years later. And as exceptions were added over the years, most relieved the Government from liability in the same circumstances as the present Act. Only a few exceptions were at one time proposed and later dropped, without counterpart in the present Act.[9] One such exception related to claims by federal

---

[8] The Government already had consented to suits upon admiralty and maritime torts involving government vessels in the Suits in Admiralty Act, 41 Stat. 525, 46 U. S. C. §§ 741–752, and the Public Vessels Act, 43 Stat. 1112, 46 U. S. C. §§ 781–790.

[9] In a few bills, an exception was made for claims arising out of negligent treatment in government hospitals. No such exception was made in the Act and sovereign immunity was clearly waived as to such claims. See, e. g., United States v. Brown, 348 U. S. 110.

Three exceptions would have barred recovery under the Act where comprehensive compensation schemes were in effect: (1) claims covered by the Federal Employees' Compensation Act; (2) claims for personal injuries incurred by military personnel on active duty; and (3) claims for destruction of personal property belonging to military personnel on active duty covered by predecessors of the Military Personnel Claims Act of 1945. The three applicable compensation statutes have been held to be exclusive: (1) Johansen v. United States,

prisoners. Six of the 31 bills introduced in Congress between 1925 and 1946 either barred prisoners from suing while in federal prison or precluded suit upon any claim for injury to or death of a prisoner.[10] That such an exception was absent from the Act itself is significant in view of the consistent course of development of the bills proposed over the years and the marked reliance by each succeeding Congress upon the language of the earlier bills. We therefore feel that the want of an exception for prisoners' claims reflects a deliberate choice, rather than an inadvertent omission.

Finally, the Report of the House Committee on the Judiciary made explicit reference to the laws of four States, which had relaxed, to differing degrees, the rule

343 U. S. 427; *Sasse* v. *United States*, 201 F. 2d 871 (C. A. 7th Cir.); but cf. *Parr* v. *United States*, 172 F. 2d 462 (C. A. 10th Cir.); (2) *Feres* v. *United States*, 340 U. S. 135 (at least to the extent of service-connected injuries of active duty personnel); and (3) *Preferred Ins. Co.* v. *United States*, 222 F. 2d 942 (C. A. 9th Cir.), cert. denied, 350 U. S. 837.

Exceptions relating to the administration of laws by the SEC and FTC or to the effect of an Act of Congress or an Executive Order no longer appear, but are subsumed under 28 U. S. C. § 2680 (a), which excludes claims based "upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid . . . ."

Other than the exception for prisoners' claims, discussed in the text, the only remaining exceptions having no counterpart in the present Act barred liability for governmental activity relating to flood control, harbor and river work, and irrigation projects. To the extent that these activities constitute "discretionary function[s]," the exception of 28 U. S. C. § 2680 (a) still preserves government immunity. *United States* v. *Ure*, 225 F. 2d 709 (C. A. 9th Cir.); *Coates* v. *United States*, 181 F. 2d 816 (C. A. 8th Cir.); *McGillic* v. *United States*, 153 F. Supp. 565.

[10] H. R. 17168, 71st Cong., 3d Sess.; S. 211, 72d Cong., 1st Sess.; S. 4567, 72d Cong., 1st Sess.; H. R. 5065, 72d Cong., 1st Sess.; S. 1833, 73d Cong., 1st Sess.; S. 1043, 74th Cong., 1st Sess.

of sovereign immunity.[11]  H. R. Rep. No. 1287, 79th Cong., 1st Sess.  The report noted that such "legislation does not appear to have had any detrimental or undesirable effect."  *Id.*, at 3.[12]  In one of those four States, New York, it was well settled by 1946 that persons could recover for injuries sustained in prison.[13]  Congressional

----

[11] The House Report accompanied H. R. 181, 79th Cong., 1st Sess., which related only to tort claims.  The Federal Tort Claims Act passed at the Second Session of the Seventy-ninth Congress as Title IV of the Legislative Reorganization Act of 1946 was virtually identical to H. R. 181, except that there was no limitation of liability.

[12] N. Y. Laws 1929, c. 467, provided, in part:

"The state hereby waives its immunity from liability for the torts of its officers and employees and consents to have its liability for such torts determined in accordance with the same rules of law as apply to an action in the supreme court against an individual or a corporation, and the state hereby assumes liability for such acts, and jurisdiction is hereby conferred upon the court of claims to hear and determine all claims against the state to recover damages for injuries to property or for personal injury caused by the misfeasance or negligence of the officers or employees of the state while acting as such officer or employee. . . ."

The laws of the other three States to which Congress referred, California, Arizona, and Illinois, conferred jurisdiction upon the state courts to hear suits against the state governments for negligence. Cal. Stat. 1893, c. 45; Ariz. Laws 1912, c. 59; Ill. Laws 1917, p. 325. However, the state courts did not construe the grant of jurisdiction as a waiver of sovereign immunity and continued to find the Government immune, at least when it was acting in a governmental rather than a proprietary capacity.  *E. g., Denning* v. *State,* 123 Cal. 316, 55 P. 1000; *State* v. *Sharp,* 21 Ariz. 424, 189 P. 631; *Monahan* v. *State,* 10 C. C. R. 10 (Ill. Ct. of Claims).

The House Report does not make this distinction apparent, nor for that matter does the report refer with any particularity to the laws of any State.

[13] *E. g., Paige* v. *State,* 269 N. Y. 352, 199 N. E. 617 (1936); *White* v. *State,* 260 App. Div. 413, 23 N. Y. S. 2d 526, aff'd, 285 N. Y. 728, 34 N. E. 2d 896 (1941).  The remedy was limited to some extent,

equanimity in the face of such liability further strengthens the conclusion that Congress intended to permit suits by federal prisoners.

Considering the plain import of the statutory language, the number of prisoners' claims among the individual applications for private bills leading to the passage of the Federal Tort Claims Act, the frequent mention of a prisoner-claims exception in proposed bills, and the reference, among others, to New York law, which permitted recovery by prisoners, we believe it is clear that Congress intended to waive sovereign immunity in cases arising from prisoners' claims.[14]

---

however, since a "civil death" statute, N. Y. Penal Law § 510, precluded suit while the person was still in prison.

At the time Congress passed the Federal Tort Claims Act, Illinois had just amended its laws and waived its sovereign immunity in tort suits. Ill. Laws 1945, p. 660 (now Ill. Rev. Stat., 1961, c. 37, § 439.8). Under this amendment, Illinois prisoners were permitted to recover against the State for negligently caused injuries incurred in prison. *E. g., Moore* v. *State,* 21 C. C. R. 282 (Ill. Ct. of Claims). This change in Illinois law occurred after H. R. Rep. No. 1287, 79th Cong., 1st Sess., was prepared and was not brought to Congress' attention.

[14] It is true, as the Government points out, that Congress has, since 1946, passed private bills for the relief of federal prisoners. *E. g.,* Act of June 21, 1955, 69 Stat. A30; Act of June 29, 1956, 70 Stat. A97. Since § 131 of the Legislative Reorganization Act of 1946, 2 U. S. C. § 190g, does not permit such bills if recovery is available under the Federal Tort Claims Act, Congress' passage of private bills must, the Government argues, be taken as congressional approval of the decisions barring suit by federal prisoners. However, the construction given an Act of the Seventy-ninth Congress by the Eighty-fourth Congress is not determinative, *Rainwater* v. *United States,* 356 U. S. 590, 593, and the acquiescence of subsequent Congresses does not of necessity constitute approval. "We do not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation." *Jones* v. *Liberty Glass Co.,* 332 U. S. 524, 534.

The Government argues nevertheless that we should imply an exception to the Federal Tort Claims Act. For one thing, the Government urges that our decision in *Feres* v. *United States,* 340 U. S. 135, controls. For another, it maintains that the impact of liability upon prison discipline would so seriously impair the administration of our prisons that Congress could not have intended such an "extreme" result.

The Court held, in *Feres* v. *United States,* that a soldier could not sue under the Federal Tort Claims Act for injuries which "arise out of or are in the course of activity incident to service." 340 U. S., at 146. Among the principal reasons articulated for doing so were: (1) the absence of an analogous or parallel liability, on the part of either an individual or a State; no individual has power to mobilize a militia, no State had been held liable to its militiamen; (2) the presence of a comprehensive compensation system for service personnel; (3) the dearth of private bills from the military; (4) the distinctly federal relationship of the soldier to his superiors and the Government, which should not be disturbed by state laws; and (5) the variations in state law to which soldiers would be subjected, involuntarily, since they have no choice in where they go. Although we find no occasion to question *Feres,* so far as military claims are concerned, the reasons for that decision are not compelling here.

First, the Government's liability is no longer restricted to circumstances in which government bodies have traditionally been responsible for misconduct of their employees. The Act extends to novel and unprecedented forms of liability as well. *Indian Towing Co.* v. *United States,* 350 U. S. 61; *Rayonier, Inc.,* v. *United States,* 352 U. S. 315. And in any event, an analogous form of liability exists. A number of States have allowed prisoners to recover from their jailers for negligently caused

injuries [15] and several States have allowed such recovery against themselves.[16]

Second, the presence of a compensation system, persuasive in *Feres*, does not of necessity preclude a suit for negligence. In *United States* v. *Brown*, 348 U. S. 110, a veteran sought damages for negligent treatment in a Veterans Administration Hospital aggravating a service-incurred injury. The veteran received additional compensation for the aggravation of the injury, even though he was no longer on active duty. The Court nonetheless held that he could bring suit under the Federal Tort Claims Act. Also, the compensation system in effect for prisoners in 1946 was not comprehensive. It provided compensation only for injuries incurred while engaged in prison industries. Neither Winston nor Muniz would have been covered.[17]

---

[15] See cases collected at 14 A. L. R. 2d 353; see also Woody, Recovery by Federal Prisoners under the Federal Tort Claims Act, 36 Wash. L. Rev. 338, 353, n. 83.

[16] New York, see note 12, *supra;* Illinois, see note 13, *supra;* North Carolina, N. C. Gen. Stat., 1958, § 143–291; *Ivey* v. *North Carolina Prison Dept.*, 252 N. C. 615, 114 S. E. 2d 812; Washington, Wash. Laws 1961, c. 136.

[17] The predecessor of 18 U. S. C. § 4126 provided compensation in 1946 only for prisoners working for Federal Prison Industries, Inc. Only 20% of all federal prisoners were so engaged. 1957 Rep. Atty. Gen. 409. And even those prisoners would not have been covered for injuries sustained outside working hours. In 1961, Congress extended compensation "to inmates or their dependents for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution where confined." 18 U. S. C. § 4126, as amended, Sept. 26, 1961, 75 Stat. 681. Even this broadened coverage fails to reach roughly 10% of the prisoners who are physically unable to work. 1957 Rep. Atty. Gen. 409. And, in any event, the compensation system still fails to provide for non-work injuries, contrary to that applicable to military personnel. Finally, the alteration of a compensation scheme 15 years after Congress passed the Federal Tort Claims Act does not provide reliable insight into the then existing congressional intent.

Third, private bills were never a problem in the military, *Feres* v. *United States,* 340 U. S. 135, 140, as Congress might have thought them to be in the case of prisoners.[18]

Admittedly, the remaining reasons for the decision in *Feres*, flowing from the impact of state law upon a federal establishment, could have relevance to the prisons as well as the armed forces. The variations in state law may to some extent hamper uniform administration of federal prisons, as it was feared they would hamper the military. And the prisoners' opportunities to recover may be affected by differences in state law over which they have no control, a position shared by service personnel whose location is determined by government order rather than personal volition. So far as uniformity of operation is concerned, however, we have been given few concrete examples of how variations in personal injury law would impair the prison system.[19] We are told not that the Government will be judged under too high a standard but under too many. This seems more a matter of conjecture than of reality. The published decisions in which prisoners have sought damages have related more to the precautions necessary to protect a kitchen worker from getting steel wool in his fingers,[20] to protect a prisoner from an exploding emery wheel,[21] or to protect a prisoner

---

[18] See note 7, *supra.*

[19] One suggestion was that Kansas might find a 10 to 1 guard to prisoner ratio necessary, while Alabama would be satisfied with 30 to 1; thus the wardens of penitentiaries at Leavenworth and Atlanta would have to shape their conduct to different state standards. It would seem more probable, however, that no State has so carefully delineated the boundary between negligence and reasonable care and that, in any event, wardens would assign the number of guards they could afford or thought necessary, rather than the number that might satisfy state concepts of due care.

[20] See *Van Zuch* v. *United States*, 118 F. Supp. 468.

[21] See *Sigmon* v. *United States,* 110 F. Supp. 906.

from falling off a ladder,[22] than to some delicate matter of prison administration. Even a matter such as improper medical treatment can be judged under the varying state laws of malpractice without violent dislocation of prison routine. Cf. *Panella* v. *United States,* 216 F. 2d 622 (C. A. 2d Cir.). Without more definite indication of the risks of harm from diversity, we conclude that the prison system will not be disrupted by the application of Connecticut law in one case and Indiana law in another to decide whether the Government should be liable to a prisoner for the negligence of its employees. Finally, though the Government expresses some concern that the nonuniform right to recover will prejudice prisoners, it nonetheless seems clear that no recovery would prejudice them even more.

In the last analysis, *Feres* seems best explained by the

"peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty . . . ." *United States* v. *Brown,* 348 U. S. 110, 112.

We also are reluctant to believe that the possible abuses stemming from prisoners' suits are so serious that all chance of recovery should be denied. It is possible, as the Government suggests, that frivolous suits will be brought, designed only to harass or, more sinister, discover details of prison security useful in planning an escape. And it is possible that the Government will be subjected to the burden of pretrial preparation, discovery, and trial, even though it prevails on the merits. This seems an inescapable concomitant of any form of liability.

---

[22] See *Lack* v. *United States,* 262 F. 2d 167 (C. A. 8th Cir.).

It is also possible that litigation will damage prison discipline, as the Government most vigorously argues. However, we have been shown no evidence that these possibilities have become actualities in the many States allowing suits against jailers, or the smaller number allowing recovery directly against the States themselves. See notes 15 and 16, *supra*.

In addition, Congress has taken steps to protect the Government from liability that would seriously handicap efficient government operations. We do not intimate any opinion upon their applicability to these complaints, since no such issue is presented for our review. We simply note that the Government is not without defenses. Most important, the Government is relieved from liability on

> "Any claim based upon an act or omission of an employee of the Government, exercising due care, *in the execution of a statute or regulation,* whether or not such statute or regulation be valid, or based upon *the exercise or performance* or the failure to exercise or perform *a discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U. S. C. § 2680 (a). (Emphasis added.) [23]

Also, the Government is not liable for the intentional torts of its employees, 28 U. S. C. § 2680 (h), for which prisoners might be especially tempted to initiate retributive litigation.[24] We are confident that district judges, sitting without a jury as required by 28 U. S. C. § 2402, will be able to dispose of complaints intelligently without undue

---

[23] See, *e. g., Morton* v. *United States,* 97 U. S. App. D. C. 84, 228 F. 2d 431.

[24] *Ibid.*

harm coming to our federal prisons.[25] ⹁ Federal rules of procedure are not so inflexible that clearly frivolous suits need embarrass prison officials or burden United States Attorneys' offices.

One last point remains. Jailers in some States are not liable to their prisoners. For example, several States have decided that a warden in charge of a penitentiary, *Carder* v. *Steiner*, 225 Md. 271, 170 A. 2d 220, or a sheriff in charge of a county jail, *Bush* v. *Babb*, 23 Ill. App. 2d 285, 162 N. E. 2d 594, is immune from suit because he exercises a quasi-judicial function requiring the use of discretion. Another has decided that the master of a house of correction has no duty of care toward his prisoners which would make him liable for his negligence. *O'Hare* v. *Jones*, 161 Mass. 391, 37 N. E. 371. And there are overtones in these decisions suggesting that liability is also denied because of the fear that prison discipline would otherwise be undermined. Such cases should not be persuasive. Just as we refused to import the "casuistries of municipal liability for torts" in *Indian Towing*, so we think it improper to limit suits by federal prisoners because of restrictive state rules of immunity. Whether a discretionary function is involved is a matter to be decided under 28 U. S. C. § 2680 (a), rather than under state rules relating to political, judicial, quasi-judicial, and ministerial functions. And the duty of care owed by the Bureau of Prisons to federal pris-

---

[25] Though there are a number of instances in which federal courts have declined to review matters of internal prison discipline and administration, frequently upon application for habeas corpus, they have reviewed serious charges of deprivation of constitutional rights, *e. g.*, *Pierce* v. *La Vallee*, 293 F. 2d 233 (C. A. 2d Cir.) ; *Sewell* v. *Pegelow*, 291 F. 2d 196 (C. A. 4th Cir.). See also *Panella* y. *United States*, 216 F. 2d 622 (C. A. 2d Cir.) (U. S. Public Health Service Hospital, Lexington, Ky.) ; *Coffin* v. *Reichard*, 143 F. 2d 443 (C. A. 6th Cir.) (U. S. Public Health Service Hospital, Lexington, Ky.).

oners is fixed by 18 U. S. C. § 4042, independent of an inconsistent state rule.[26] Finally, having decided that discipline in the federal-prisons will not be so seriously impaired that all recovery should be denied for negligently inflicted injuries, we should not at the same time make recovery depend upon a State's decision to the contrary.[27]

The Federal Tort Claims Act provides much-needed relief to those suffering injury from the negligence of government employees. We should not, at the same time that state courts are striving to mitigate the hardships caused by sovereign immunity,[28] narrow the remedies pro-

---

[26] 18 U. S. C. § 4042 provides:
"The Bureau of Prisons, under the direction of the Attorney General, shall—

"(1) have charge of the management and regulation of all Federal penal and correctional institutions;

"(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

"(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."

[27] Respondent Muniz suggests that a federal law should be developed, since some federal prisons are within federal enclaves. The suggestion is impractical, since some prisons are not within enclaves, and is forestalled by 45 Stat. 54, 16 U. S. C. § 457, which provides:
"In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be." See, e. g., Stokes v. Adair, 265 F. 2d 662 (C. A. 4th Cir.), cert. denied, 361 U. S. 816.

[28] See, e. g., Holytz v. Milwaukee, 17 Wis. 2d 26, 115 N. W. 2d 618; Muskopf v. Corning Hospital Dist., 55 Cal. 2d 211, 359 P. 2d 457;

vided by Congress.[29]   As we said in *Rayonier, Inc.*, v. *United States, supra,* at 320, "There is no justification for this Court to read exemptions into the Act beyond those provided by Congress.   If the Act is to be altered that is a function for the same body that adopted it."

*Affirmed.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

*Williams* v. *Detroit,* 364 Mich. 231, 111 N. W. 2d 1; *Molitor* v. *Kaneland Community Unit Dist. No. 302,* 18 Ill. 2d 11, 163 N. E. 2d 89; *Hargrove* v. *Cocoa Beach,* 96 So. 2d 130 (Fla.)..

[29] See Pound, The Tort Claims Act: Reason or History? 30 NACCA L. J. —— (1963).