**Urbano LABOY, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 80–2119 (PG).**

United States District Court, D. Puerto Rico.

Nov. 7, 1985.

Ernesto Maldonado Pérez, San Juan, Puerto Rico, for plaintiffs.

Wanda Rubianès-Collazo, Asst. U.S. Atty., Hato Rey, Puerto Rico, for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

This was a tort action brought against the Veterans Administration for alleged negligence in its treatment of Felix Luis Laboy, an out-patient in the Mental Hygiene Clinic at the Veterans Administration Hospital, San Juan, Puerto Rico.

On May 23, 1978, Mr. Laboy was found dead by the thirteen year old girl with whom he was cohabiting. It appeared at the time he had ingested an undetermined amount of a prescription sleeping aid commercially known as Dalmane.[1] Decedent had been prescribed this medication at the Mental Hygiene Clinic along with medication for the treatment of his mental condition, previously diagnosed as schizophrenia, undifferentiated type.

Jurisdiction was predicated upon 28 U.S.C. 1331, 1346(b) and 2671, *et seq.*

A hearing on the merits of the action was held at which the parties presented expert testimony on psychiatry and toxicology. Some family members of the deceased veteran were also present and testified at this hearing.

## FINDINGS OF FACT

After an external examination of decedent's body,[2] along with general information furnished by decedent's father and the results of a Toxicology Report[3] submitted by the Institute of Forensic Medicine, the Coroner's conclusion with the expert testimony of the toxicologist who co-signed the report offered by plaintiffs. The toxicologist's testimony established that the urine sample was scientifically unreliable to determine the cause of death; the only reliable method being that of a blood test. In this case no blood trace levels of the drug were found.

Dalmane, a mild hypnotic, is widely used in the medical field, especially in the practice of psychiatry. It is the accepted medical treatment for insomnia and is often prescribed for ambulatory psychiatric patients because of its mildness and safety.

In the instant case it was established with certainty that death in this case could not have been caused by an overdose of the drug. Notwithstanding the fact that the urine levels reported were sufficiently reliable to form the basis of a scientific opinion

---

1. Chemically known as flurazepam hydrochoride, it is a hypnotic agent used in the treatment of all types of insomnia.

2. No autopsy was ever performed on the body.

3. The Toxicology report only indicated that flurazepam (Dalmane) was present in the urine in a concentration of 1.7 mlg. percent. Alcohol, ferrotiazine, strychnine or librium were completely absent from the blood or urine. Barbiturates and salicylates were also absent from the blood.

as to the cause of death, it also was proven that the trace levels in the urine represented approximately thirty-four (34) mlg. of Dalmane, which amounts to about one capsule.[4] It is evident that one capsule is within the accepted therapeutic levels of the drug.

We believe plaintiffs were required to prove, with reliable certainty, that death was proximately caused by a drug prescribed by the Veterans Administration. Cause of death may not be established by mere conjecture. Plaintiffs relied entirely upon the Coroner's conclusion as to cause of death. The accuracy of that conclusion was put in jeopardy immediately when the experts conceded that the levels of the drug found in the urine were not reliable and, even if reliable, the amount actually discovered did not constitute a lethal dose. Thus, Plaintiffs' main argument of Dalmane intoxication was ruled out by expert evidence as the proximate cause of death. Therefore, we find plaintiffs' failed to meet the threshold levels of proof required to impose liability on the Veterans Administration.

Patients, such as decedent, are customarily treated at the Veterans Administration on an ambulatory basis. Only in cases where special precautions are to be taken or where other exigent circumstances require it, will hospitalization be recommended. This is in accordance with the modern trend in the practice of psychiatry which is to allow a patient to maintain close contact with his family and thereby remain a functioning member of society instead of institutionalizing him in a mental hospital. This practice ameliorates the detrimental effect which confinement necessarily entails.

To adequately meet their burden, plaintiffs had to support their contention that the Veterans Administration's determination not to hospitalize decedent was negligent and that some other treatment should necessarily have been undertaken. Plaintiffs most strongly argued that a potentially suicidal patient,[5] such as decedent, must be kept under constant surveillance and/or, where not under constant medical supervision, command of the patient's medications should not be entrusted to him.

It was established, however, that decedent showed no particular signs of non-compliance with the treatment given to him. In fact, four days before his death the patient was seen at the Mental Hygiene Clinic and was found by the attending physician to be responding well to the medication. During his interview the patient appeared oriented and coherent and lacking any signs of depression. Specifically, it was found he had no suicidal or homicidal thoughts. The patient's response was found to be fair and it was decided that he was to continue his present treatment. Decedent had also been interviewed on two prior occasions and similarly displayed no warning signs which would cause the physician to seek his immediate institutionalization.

Moreover, as to plaintiffs' argument that members of plaintiffs' family should have been entrusted with the medications, it was clearly established that the family members had no control over decedent. As shown by the testimony of his parents and siblings, decedent consistently failed to heed the advice and counsel they offered him. The girl with whom he cohabitated similarly had no control over his actions. Under such circumstances, and absent a clear indication that decedent was not adequately administering his own medications, we will not find that the ambulatory treatment given was negligent in this regard.

---

4. Further, a lethal dose of the drug would approach 5 grams in the blood contents. Such a lethal dose translates to approximately 100 capsules of 30 mlg. each.

5. Plaintiffs argue that the suicidal ruminations of the decedent upon being admitted to the Hato Rey Psychiatric Clinic dictates that he be treated as a suicidal risk in any further treatment. It is clear that mere suicidal ruminations do not trigger such precautions. Only after suicidal "tendencies" are present does the need to take such precautions really surface. *Crespo Pérez et als. v. Hato Rey Psychiatric Hospital, Inc.,* 83 JTS 105 (November 16, 1983).

## CONCLUSIONS OF LAW

█ Under the Federal Tort Claims Act the United States may be held liable in tort: "... in the same manner and to the same extent as a private individual under like circumstances."

28 U.S.C. § 2674 (1976). Such liability, however, is said to depend upon whether a private individual under like circumstances would be liable under state law. *United States v. Muñiz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963). Thus, where the alleged acts of negligence occurred in Puerto Rico, as in the case here, the rights and liabilities of the parties to this action are governed by the substantive law of Puerto Rico. See *Johnson v. United States*, 271 F.Supp. 205 (W.D.Ark.1967).

To that effect, Article 1802 of the Puerto Rico Civil Code provides that:

"A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity."

Title 31 § 1802 Puerto Rico Civil Code.

Since the leading case of *Rivera v. Dunscombe*, 73 D.P.R. 819 (1952) was decided, the Supreme Court of the Commonwealth of Puerto Rico has consistently required proof of negligence in order to sustain a cause of action damages against a physician or a hospital. See, e.g., *Levis Saez v. Municipio de Ponce*, 84 D.P.R. 535; *Pérez v. E.L.A.*, 95 D.P.R. 745; *Vda. de Torres v. Womble*, 99 D.P.R. 859 and *Rivera v. E.L.A.*, 99 D.P.R. 890.

The minimum standard of medical attention which can currently be legally required in malpractice cases in Puerto Rico is found in *Oliveros v. Abréu*, 101 D.P.R. 210 (1973). In recognition of modern methods of teaching and communication, the Court here created a new standard of due care for physicians, one which would fulfill the generally recognized requirements of the medical profession, see *id.* at 226, and not simply those of the community in which the doctor practices, see *Rivera v. Dunscombe, su-*

*pra*, at 226–227. However, the court in *Oliveros* expressly reaffirmed its position that hospitals and clinics should be held to a different standard—that of reasonable care and attention as required by the circumstances. *Soc. de Gananciales v. Presbyterian Hosp.*, 88 D.P.R. 391, 399 (1963); *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960); *Jesús Lozada Aponte et als. v. E.L.A.*, 85 JTS 18 (March 14, 1985).

There is a presumption in our jurisprudence, absent evidence to the contrary, that a physician has adequately treated his patient and has exercised due care in the administration of that treatment. *Rivera v. E.L.A.*, 99 D.P.R. 890 (1971). Thus, it is plaintiffs' burden to show, by a preponderance of the credible evidence, that a physician has failed to meet the standard of care recognized in the medical profession. Moreover, as the defendant Veterans Administration in the instant case is a hospital or clinic, plaintiffs must prove that the defendant failed to exercise even that degree of care which would be exercised by a reasonable and prudent man in the same situation. *Soc. de Gananciales v. Presbyterian Hospital, supra*, at 398; *Pascual Márquez Vega, etc. v. Héctor Martínez Rosado, etc.*, 185 JTS 41 (May 15, 1985).

Even where negligence can be established, however, there can be no liability for malpractice unless the plaintiff can establish that his damages were the direct result of the physician's negligence. This causal relationship cannot be established through mere speculation or conjecture. *Rivera v. E.L.A., supra*, at 898; *Pérez Cruz v. Hospital La Concepción*, 84 JTS 87 (Oct. 29, 1984). As stated by the Supreme Court of the Commonwealth of Puerto Rico in *Rivera v. Dunscombe, supra*, at 839:

"The mere possibility that a physician's negligence may have been the proximate cause of the harm is not sufficient to establish a case of malpractice based on negligence against a defendant; if there exists a possibility that other causes might have intervened, it is plaintiff's duty to eliminate these possibilities, dem-

onstrating that the physician's negligence really was the proximate cause of the injury ..."

Therefore, where the evidence indicates more than one probable cause of harm, the doctor cannot be held liable unless it is shown that his negligence was, with greater probability, the actual cause of the harm. See, e.g., *Pérez v. E.L.A.*, 95 D.P.R. 535 (1962).

■ In the instant case, plaintiffs rely on the Coroner's Report attributing the cause of death to Dalmane as the basis for his contention that this harm was proximately caused by the physician's act of prescribing Dalmane to decedent. We are not obligated to follow the opinion expressed by this expert, especially where his opinion conflicts with the testimony of other experts which we have had occasion to hear at a trial on the merits of the action. See *Rivera v. Duncombe, supra*, at 835. Here the defendant established that the information upon which the Coroner based his report was unreliable and, in any event, the amount or trace levels of Dalmane found in the patient's body was insufficient to cause his death. Since no autopsy was performed in this case, there exists a myriad of possible causes of death other than the one brought forth by plaintiffs. Thus, plaintiffs have failed to show with reasonable certainty that the patient died of a condition proximately caused by the negligence of the prescribing physician.

Plaintiffs also argue that the physician was negligent in entrusting the medication to the decedent in view of his mental condition. The defendants, aided by the presumption of due care and adequate treatment maintain that only accepted and proper methods of treatment were followed and that in their best judgment, the patient appeared to be responding very well to the outpatient treatment he was receiving at the hospital.

■ The case of *Rivera v. E.L.A., supra*, is relevant in this regard. As a basic principle, the Court states that a physician should not be held liable for an error of judgment unless such error could be considered an obvious one. Even a showing by plaintiff that some other physician would have acted differently does not justify a conclusion of negligence by the defendant. *Id.* at 899–900. In *Rivera*, the patient was treated for gallstones but died of a ruptured appendix, which had remained undiagnosed because of the obscure and atypical nature of the symptoms. The court refused to hold the physician liable for negligence where the patient's symptoms were not discernible in the usual and current manner. *Id.* at 902. In the present case the patient appeared to the treating physician to be coherent and well-oriented, giving them a reasonable basis to believe that he was coping properly as an outpatient and that he could responsibly manage his medication. There was no visible indication to the contrary. Plaintiffs maintain that the only proper thing to do would have been to hand the medication over to the family members. Yet, in their own testimony, the family members admitted that decedent led his life totally independent of their control and influence. It is clear that neither his parents, his siblings nor his girlfriend could in any way advise him or supervise him in the taking of his medication. Thus, the plaintiffs have failed to establish that the treating physicians were negligent in prescribing sleeping aids to the patient or in failing to institutionalize him.

In the absence of proof of negligence and of proximate causation we must conclude that plaintiffs have failed to establish a prima facie case against the Veterans Administration.

IT IS, THEREFORE, HEREBY ORDERED that this case stand dismissed.

IT IS SO ORDERED.